**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

MARIO BANUELOS,

Plaintiff,

v.

FLEETPRIDE, INC., et al.,

Defendants.

Case No. 1:25-cv-00308 JLT FJS

ORDER DENYING MOTIONS TO REMAND AND COMPEL ARBITRATION

(Docs. 6, 16)

Mario Banuelos moves to remand this case to state court (Doc. 6), and defendant FleetPride, Inc. moves to compel arbitration under the Federal Arbitration Act (Doc. 16). Both motions are **DENIED**.

**BACKGROUND**

FleetPride distributes and resells heavy-duty truck and trailer parts. (Docs. 1-1 ¶ 16, 16-3 ¶ 3.) Banuelos worked for FleetPride in one of its distribution centers as an hourly worker from 2022 to 2024. (Doc. 1-1 ¶ 17.) He alleges the company was "engaged in an ongoing and systematic scheme of wage abuse" and asserts several wage and hour claims under the California Labor Code and Business and Professions Code, both on his own behalf and on behalf of a proposed class of similarly situated workers. (*See id.* at 4–7, 12–21.)

Banuelos originally filed this case in state court. (*Id.* at 1.) FleetPride removed it to this Court based on its allegations that the proposed class included more than 100 members, that the

parties were citizens of different states, and that the case put more than $5 million in controversy. (*See* Doc. 1 at 5–20.)

The parties have now each filed motions that would, if granted, effectively send their dispute to a different venue. Banuelos moves to remand the case to state court where he filed it. (Doc. 6.) He does not dispute FleetPride's allegations about the size of the proposed class and the parties' citizenship; he contends only that FleetPride relied on insufficient evidence and unreasonable assumptions in estimating the amount in controversy. (*See id.*) FleetPride opposes the motion, and it is now fully briefed. (Docs. 7, 8.) FleetPride moves for its part to compel arbitration of Banuelos's claims on an individual basis. (Doc. 16.) Banuelos opposes the company's motion, which is now also fully briefed. (*See* Docs. 18, 19.) The Court begins with the motion to remand the case to state court because it represents a jurisdictional dispute.

**REMAND**

Federal law allows a defendant to remove a case from a state court to the appropriate federal district court if that court would have had jurisdiction over the case originally. 28 U.S.C. § 1441(a). To accomplish the removal, the defendant must file a notice in the federal district court, which must contain among other things "a short and plain statement of the grounds for removal." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 83 (2014) (quoting 28 U.S.C. § 1446(a)). It is not necessary for the defendant to submit evidence with this notice. Plausible allegations suffice. *See Arias v. Residence Inn by Marriott*, 936 F.3d 920, 925 (9th Cir. 2019).

If, as in this case, the plaintiff contests the defendant's allegations about the amount in controversy, then the defendant must prove "by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million," i.e., that the amount in controversy is more likely to exceed the $5 million threshold than to fall short of it. *Ibarra v. Manheim Investment, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015). The defendant can, for example, offer declarations, exhibits, and other "summary-judgment-type evidence." *Id.* (citation omitted). A defendant can also rely on reasonable assumptions, including those based on the plaintiff's own allegations. *Harris v. KM Indus., Inc.*, 980 F.3d 694, 701 (9th Cir. 2020); *Arias*, 936 F.3d at 926–27. It may

not rely on speculation or conjecture, however, nor assumptions “pulled from thin air.” *Ibarra*, 775 F.3d at 1199. An assumption must have “some reasonable ground” beneath it. *Id.* Plaintiffs may respond by submitting their own evidence in reply or by explaining why the defendants’ assumptions are unreasonable. *See Harris*, 980 F.3d at 699. The court then weighs the evidence, considers whether the defendant’s assumptions are reasonable, and decides whether the amount in controversy is more likely to exceed the jurisdictional threshold than to fall short of it. *See id.* at 701.

As noted, Banuelos contends that the company has relied on unreasonable assumptions and insufficient evidence to support its allegations about the amount in controversy. The company’s estimate of the amount in controversy is based primarily on summary statistics provided by its director of human resources. (*See* Doc. 1-4 at 2–4.) She offered these statistics in a declaration attached to the company’s notice of removal. (*See id.*) Banuelos did not raise many concerns specific to that declaration in his original motion. He contended more generally that the company had pulled its estimates out of thin air, had overread his complaint, and had “failed to provide any evidence whatsoever.” (*See, e.g.*, Doc. 6 at 11–13.) In reply, however, after the company reiterated its position and cited the previously filed declaration, Banuelos argued for the first time that the declaration was “self-serving,” “deficient,” “conclusory,” contained “vague estimates,” and lacked a foundation. (*See* Doc. 8 at 5.)

By holding these arguments in reserve, Banuelos inappropriately deprived the company of a fair opportunity to respond. He could and should have raised his objections in connection with his original motion. It would be appropriate to overrule them summarily for that reason, but they are not compelling in any event. The company’s human resources director explained that she personally reviewed its personnel, payroll, and wage records for the employees who would be members of the proposed class. (*See* Doc. 1-4 at 2–3.) She is also among the employees who maintain those records in the ordinary course of business. (*See id.*) And as she explains, the data includes information about how many days employees worked, on what dates, and at what hourly rates. (*See id.*) Federal courts commonly rely on similar evidence in disputes about the amount in controversy. *See, e.g.*, *Arias*, 936 F.3d at 923–24.

Turning back to the company's estimate of the amount in controversy, its calculations are built on five of the claims in Banuelos's complaint. The company took each of those claims in turn in its notice of removal. (*See* Doc. 1 at 9–18.) The Court will do the same here.

In Banuelos's first claim, he alleges the company did not pay him and other similarly situated employees for all of the hours they worked. (*See* Doc. 1-1 at 12–13.) The company's director of human resources found that it had employed 514 people in California over the relevant time. (Doc. 1-4 at 3.) These employees worked a total of 34,499 workweeks in that time, and on average, they worked more than eight hours per day. (*Id.*) This means that by Banuelos's allegation, any additional unpaid work would likely have been compensated at the overtime rate. The company assumed that Banuelos will attempt to prove in this case that employees in the proposed class worked about an hour per week of overtime without pay. To support this estimate, it relied on his allegations the company employed a "systematic scheme or wage abuse," "regularly" required work off the clock, and had "policies" that were common to the whole of the proposed class. (Doc. 1-1 ¶¶ 21, 28, 29, 31, 32, 33.) The average regular hourly wage for the proposed class was $19.71, which translates to an overtime overly rate of $29.57. (*See id.*) One hour of unpaid work per week at a rate of $29.57 per hour over 34,499 weeks is about $1.0 million. (*See* Doc. 1 at 11.) These estimates and assumptions were reasonable. An hour of unpaid work per week is a few minutes of unpaid work per day. That is a reasonable interpretation of Banuelos's allegations about work off the clock that was done "regularly" and part of a "systematic scheme."

In Banuelos's second claim, he alleges the company did not permit him and other employees to take full and free breaks for their meals, as required by state law. (*See* Doc. 1-1 at 13–14.) He alleges the company "routinely failed" to permit him and other employees to take these breaks and "regularly impeded or discouraged" him and other employees from taking full breaks. (*Id.* ¶¶ 21, 22.) He said this was true "[t]hroughout the time period involved in this case." (*Id.* ¶ 24.) Based on these allegations, the company assumed that Banuelos will attempt to prove in this case that employees did not receive a full and free meal break on about three out of five days on average. (Doc. 1 at 12.) The company's human resources director found that employees

in the proposed class worked 172,495 days. (Doc. 1-4 at 3.) If employees did not have full and free breaks on three out of every five days they worked, then they would have missed a total of 103,497 breaks. At the $19.71 average hourly rate, these missed breaks would translate to damages of about $2.0 million. (*See* Doc. 1 at 13.) Again the Court finds these assumptions and calculations were based on a reasonable interpretation of the complaint. It is reasonable to assume that an event occurring "routinely" or "regularly" in the workplace is one that happens on about three days out of every five.

The company relied on a similarly reasonable method to estimate the value of Banuelos's claim for missed rest breaks, his third claim. (*See id.* at 13–15.) He alleges that the company "routinely failed" to permit him and others to take rest breaks, that employees "regularly" missed their breaks, and that this was part of a policy that applied to the proposed class as a whole, "[t]hroughout the time period involved in this case." (Doc. 1-1 ¶¶ 21, 24–26.) The company assumed from these allegations that Banuelos will attempt to show that employees did not have full and free rest breaks on three out of every ten days they worked. (Doc. 1 at 14.) This would mean they missed a break on about 21,748 of the days they worked. (*See id.* at 15.) At the $19.71 average hourly rate, these missed breaks would translate to a damages claim of about $1.0 million. (*Id.*)

Banuelos alleges in connection with his fifth claim that the company "regularly failed to pay" him and other employees "all wages owed to them upon discharge or resignation" in violation of California Labor Code section 203. (Doc. 1-2 ¶ 34.) The company's human resources director found that 220 members of the proposed class had left the company over the relevant time. (Doc. 1-4 at 3.) The company assumed that Banuelos will attempt to prove in this case all of these employees were underpaid or missed at least one meal or rest break, citing his allegations about regular violations and systematic policies. (*See* Doc. 1 at 15.) This would mean that under Banuelos's theory of the case, the company owed all 220 employees at least some unpaid wages or penalties by the time they left. (*See id.*) The departing employees' average hourly rate was $18.04. (Doc. 1-4 at 3.) Assuming these employees would seek the maximum statutory penalty of thirty days' pay, the company estimated that the section 203 claim put about

$1.0 million in controversy: $18.04 per hour × eight hours per day × thirty days × 220 employees is $952,512. (*Id.*) This estimate is logical and reasonable.

Finally, Banuelos is pursuing a claim under California Labor Code section 226(a) based on his allegation that his and other employees' wage statements were inaccurate. (*See* Doc. 1-4 at 18–19.) He alleges the wage statements were "regularly" inaccurate over the whole "time period involved in this case." (*Id.* ¶ 36, 37, 38, 86.) The company inferred from these allegations (and from the allegations about unpaid overtime and missed breaks, summarized above) that Banuelos will attempt to prove that every wage statement included at least one inaccuracy. (Doc. 1 at 17.) The company's human resources director found that it had employed 249 people over the relevant time period and that it had issued 8,870 wage statements to these employees in that time. (Doc. 1-4 at 3.) The company assumed that Banuelos will attempt to prove that all 249 employees will request a $50 penalty for their first inaccurate statement ($12,450 in total) and $100 for each inaccurate statement that followed ($862,100 in total), which would put about $0.9 million in controversy. (Doc. 1 at 17.) This logic and the assumptions behind it are again a reasonable reading of Banuelos's allegations and legal theories.

The total of the amounts above is between $5 million and $6 million:

- $1.0 million for unpaid overtime
- $2.0 million in meal break penalties
- $1.0 million in rest break penalties
- $1.0 million in penalties for shortfalls in final paychecks
- $0.9 million in penalties for inaccurate wage statements

To reiterate, this sum represents the dollar value that only five of Banuelos's nine claims put in controversy. It also sets aside the value of his request for attorneys' fees. As the company emphasizes in its motion and notice of removal, attorneys' fee awards in California wage and hour class actions can represent a substantial fraction of the $5 million jurisdictional threshold, or potentially even exceed it. (*See, e.g.*, Doc. 7 at 24–26.) It is not necessary to decide what figure would be appropriate to use in estimating the amount in controversy here. The fact of the request simply serves as a reassurance that the company's estimate of the amount in controversy is

reasonable, even conservative. And so, if one of the claims, such as the meal break claim, should not actually be quite so highly valued, the case would likely still put more than $5 million in controversy. For these reasons, FleetPride has demonstrated that the amount in controversy is probably higher than the jurisdictional threshold. There is no doubt that the other jurisdictional requirements are satisfied. Banuelos's motion to remand is denied.

**FEDERAL ARBITRATION ACT**

The company contends in its motion that Banuelos must pursue his claims individually in arbitration rather than in a class action in court. (Doc. 16 at 7.) It moves to compel arbitration under the Federal Arbitration Act (FAA), to dismiss Banuelos's class claims, and to stay this case until the arbitration is complete. (*Id.*)

As the Supreme Court has explained, "the FAA was a response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). "To give effect to this purpose, the FAA compels judicial enforcement of a wide range of written arbitration agreements." *Id.* Written arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4." 9 U.S.C. § 2. These is an exception: the FAA states in its first section that it does not "apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Banuelos argues that he was in a "class of workers engaged in foreign or interstate commerce." (Doc. 18 at 5–11.) FleetPride disagrees. (*See* Doc. 19 at 5–9.)

The Ninth Circuit took up a strikingly similar case not long ago. Like Banuelos, the plaintiff was a man who worked in a warehouse. *See Ortiz v. Randstad Inhouse Servs., LLC*, 95 F.4th 1152, 1157 (9th Cir.), *cert. denied*, 145 S. Ct. 165 (2024). The warehouse received watches, apparel, and shoes from suppliers, usually from sources outside the United States; stored those products for a few days or weeks; and eventually shipped them out to consumers and retailers within the United States. *Id.* The plaintiff's job was to unload and pick up packages, transport them to warehouse racks to organize them, move packages to a "picking section" for

further sorting, help others obtain packages so they could be shipped out, and otherwise help prepare packages to leave the warehouse. *Id.* at 1158. There was some uncertainty about whether the plaintiff had unloaded packages from shipping containers in particular, so both the district and circuit courts assumed he did not. *Id.* It was clear in any event that employees with the plaintiff's job description were not responsible for unloading products when they arrived at the warehouse, nor for loading products for their departure. *See id.* at 1157–58. It was also undisputed that the defendant did not move products to or from its warehouse. *See id.* at 1157. It received them, stored them, processed them, and prepared them for further distribution. *Id.*

The Ninth Circuit read the Supreme Court's opinions in *Circuit City Stores v. Adams* and *Saxon v. Southwest Airlines Co.* as setting up a "two-step analysis" for deciding whether a particular person was in a "class of workers engaged in foreign or interstate commerce." *Id.* at 1159 (citing 532 U.S. 105 (2001) and 596 U.S. 450 (2022)). First, the court defines the class of workers. *See id.* The goal is not to decide whether the plaintiff worked for a transportation company or whether the employer was part of the transportation industry. *See id.*; *see also Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024) (reaching the same conclusion after *Ortiz*). The goal is to describe the "specific nature" of the work the employee performed. *Ortiz*, 95 F.4th at 1159. Second, the court decides whether that class of workers is engaged in foreign or interstate commerce. *Id.* The workers must "play a direct and necessary role in the free flow of goods across borders." *Id.* at 1159–60 (quoting *Saxon*, 596 U.S. at 458). "[T]hey must be 'actively engaged in transportation' of those goods across borders via the channels of interstate commerce.'" *Id.* at 1160 (quoting *Saxon*, 596 U.S. at 458). "[W]orkers who are 'intimately involved with the commerce (e.g., transportation) of the cargo' also qualify." *Id.* (quoting *Saxon*, 596 U.S. at 458). But there is no "strict requirement that a worker must personally transport goods interstate." *Id.* at 1159.

At the first step, the Ninth Circuit held in *Ortiz* that the "class of workers" was made up of people whose "job duties included exclusively warehouse work," such as "transporting packages to and from storage racks" and helping others obtain and prepare packages for shipping. *Id.* at 1161. That was the work the plaintiff had performed. *See id.* At the second step, the circuit

agreed with the district court that the people who performed this work were part of a class of workers engaged in foreign or interstate commerce. *Id.* at 1161–62. They "ensured that goods would reach their final destination by processing and storing them while they awaited further interstate transport." *Id.* at 1162. They handled watches, shoes, and apparel "as they went through the process of entering, temporarily occupying, and subsequently leaving the warehouse." *Id.* at 1162. It did not matter that the plaintiff "performed his duties on an entirely intrastate basis." *Id.* It did not matter that "he did not transport the goods across any appreciable distance." *Id.* at 1163. It did not matter that his employer was in the warehouse business rather than the trucking, railroad, or air transport business. *Id.* at 1164–65; *see also Bisonnette*, 601 U.S. at 252 ("[T]here is no such requirement.").

The result is the same in this case. Banuelos worked in a warehouse. (Doc. 18-1 ¶ 3.) The warehouse received its inventory by truck from manufacturers and other FleetPride branches, and it is stored that inventory in the warehouse until one of the company's retail branches submitted an order to restock its shelves. (Doc. 19-1 ¶¶ 3, 11.) When an order came in, Banuelos was assigned to gather and organize products, and then he helped prepare those products for shipping to one of the hundreds of locations that FleetPride operates in 46 states. (*See* Docs. 16-3 ¶ 3; 18-1 ¶¶3–5; 19-1 ¶ 5–7.) The "class" of workers is essentially the same in this case as it was in *Ortiz*: people doing "warehouse work," "transporting packages to and from storage racks," helping others obtain and prepare packages for shipping, and so on. 95 F.4th at 1161. As in *Ortiz*, this class of workers was engaged in interstate commerce. Banuelos and others with his same job description helped ensure that FleetPride's products reached their final destinations quickly, safely, and without damage. (*See* Doc. 19-1 ¶¶ 5–7, 12–16.) They handled heavy-duty truck and trailer parts "as they went through the process of entering, temporarily occupying, and subsequently leaving the warehouse—a necessary step in their ongoing interstate journey to their final destination." *Ortiz*, 95 F.4th at 1162.

The company's effort to separate this case from *Ortiz* is largely semantic. (*See* Doc. 19 at 8–9.) It makes distinctions between phrases like "transporting packages" and "handled inventory," for example. (*See id.*) It does not dispute that Banuelos's job was an essential step in

the path that a product took from its manufacturer to the retailer in interstate commerce. (*See id.*) A truck part does not leave "the stream of interstate commerce" simply because it takes a "pause in the journey" at a warehouse. *Carmona Mendoza v. Domino's Pizza, LLC*, 73 F.4th 1135, 1138 (9th Cir. 2023).

The company also predicts that if Banuelos is correct, then just about "any worker who moves items at a workplace" will "qualify as a transportation worker" if those items "eventually move across state lines." (Doc. 19 at 8.) It offers the example of a "McDonald's worker" who wraps up a cheeseburger that eventually makes its way into the hands of a patron who "traverses state lines." (*Id.* at 8 n.5.) FleetPride is correct to "note that not every connection to commerce will suffice, no matter how tenuous the connection may be." *Ortiz*, 95 F.4th at 1163. There may be closer cases in the future, but this is not one of them. Banuelos's job cannot meaningfully be distinguished from the jobs that the employees performed in *Saxon*, *Ortiz*, and other cases like them. *See id.* at 1161–62; *see also*, *e.g.*, *Esperon v. Partners Personnel-Mgmt. Servs., LLC*, No. 25-06251, 2026 WL 2078202, at *3–5 (C.D. Cal. May 6, 2026) (rejecting similar arguments in a similar wage and hour case by a warehouse worker). The FAA does not apply.

**STATE LAW**

FleetPride relied exclusively on the FAA in its motion to compel arbitration. It emphasized that the disputed arbitration agreement "expressly states that it shall be governed by and interpreted in accordance with the FAA," it contended that there was "no ambiguity that the parties intended the FAA to govern," and it argued that the FAA "would still apply" even if it "were not explicitly incorporated." (Doc. 16 at 16 (citations and quotation marks omitted).) In its reply, however, the company argues for the first time that the arbitration agreement is enforceable "even if the FAA does not apply," citing California law. (Doc. 19 at 9.)

FleetPride emphasized earlier in this case "that the Court may disregard new arguments and/or evidence presented by a movant for the first time in a reply brief." (Doc. 10 at 2.) It collected authority in a footnote to emphasize that this rule was "well-settled," and it urged the Court to disregard the evidence and arguments that Banuelos could have raised in his motion to remand but chose to make in his reply instead, after the weaknesses in his initial position had

become apparent. (*See id.* at 2–3 n.1.)

These were valid points then, and they are valid points now. Federal district courts require attorneys and their clients to prepare well, to file complete and comprehensive briefs, and to present their best, strongest, and most relevant arguments up front. *See, e.g.*, *United States ex rel. Doe v. Biotronik, Inc.*, No. 09-3617, 2015 WL 6447489, at *2–3 (E.D. Cal. Oct. 23, 2015), *aff'd*, 716 F. App'x 590 (9th Cir. 2017). A different rule would be less efficient. It would also be more vulnerable to abuse. Litigants could hold arguments in reserve. They could avoid page limits. They could needlessly prolong and complicate a case by forcing opposing parties to prepare supplemental filings. In the worst cases, even "relatively modest" disputes could balloon into messes of ex parte applications, other "ad hoc requests," and all of the related oppositions and replies. *See id.*

There are, of course, exceptions to this general rule. Sometimes a party's failure to make an argument or to submit evidence is essentially harmless. It might be simple enough to see why the late submission will lead to no different result. *See, e.g.*, *Sweet v. Cardona*, 657 F. Supp. 3d 1260, 1275–76 (N.D. Cal. 2023). That was true of the objections Banuelos made to the declaration by the company's human resources director, as discussed above. By contrast, it is not obvious whether the result would be the same or different if the Court considered the company's argument that arbitration is also required as a matter of state law. Applying state law in a case like this one can be a difficult, divisive, and complex endeavor. *See, e.g.*, *Ortiz v. Randstad Inhouse Servs., LLC*, No. 23-55147, 2024 WL 1070823, at *2–7 (9th Cir. Mar. 12, 2024) (unpublished majority and dissenting opinions on the applicability and results of state law in the warehouse worker case discussed above); *Mitchell v. Lineage Logistics Servs. LLC*, 769 F. Supp. 3d 1132, 1143–47 (E.D. Cal. 2025) (deciding some of the plaintiff's wage and hour claims were subject to arbitration under state law while others were not).

Sometimes courts also excuse a late submission and consider the new material after allowing the opposing party to respond. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). Diligent parties and their attorneys cannot always be expected to identify and run every decisive issue to ground at the very first, in an opening brief. The state law issue here, however,

is one that FleetPride could and should have raised earlier. Other defendants who have moved to compel arbitration in other similar cases—including, for example, the defendants in *Ortiz* and other cases the parties cite—have argued in the alternative that arbitration was also mandatory as a matter of California state law. *See, e.g.*, *Ortiz v. Randstad Inhouse Servs., LLC*, No. 23-55147, 2024 WL 1070823 (9th Cir. Mar. 12, 2024) (unpublished), *reversing in part* No. 22-01399, 2023 WL 2070833, at *4 (C.D. Cal. Jan. 18, 2023); *see also, e.g.*, *Mitchell*, 769 F. Supp. 3d at 1143–47; *Shanley v. Tracy Logistics LLC*, No. 24-01011, 2025 WL 19012, at *7–8 (E.D. Cal. Jan. 2, 2025).

New arguments and evidence can sometimes also be reasonable as responses to an opposition brief. Courts commonly consider this type of information. *See, e.g.*, *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018). Some of the company's arguments do respond to Banuelos's opposition. He makes two arguments about state law in his opposition. First, he contends at the threshold that California law "prohibits mandatory arbitration of wage claims," citing Labor Code sections 229 and 432.6(a). (Doc. 18 at 5.) Second, he contends the agreement was "illusory" and does not represent a meeting of the minds as a matter of state contract law. (*Id.* at 12–15.) FleetPride was reasonable to include responses to these arguments in its reply, for example by contending, as it did, (1) that the FAA preempts sections 229 and 432.6(a), (2) that those sections do not prohibit arbitration even on their own terms, (3) that the contract formation issues were for the arbitrator to resolve, and (4) that an agreement was in fact formed. (*See* Doc. 19 at 8–11.) It was not reasonable, however, for the company to change the fundamental theory of its motion, i.e., to argue that arbitration was mandatory under state law rather than the FAA. If the FAA did apply, as the company originally contended, then the Court could not grant its motion without rejecting Banuelos's arguments about state law. But because the FAA does not apply, an order addressing those arguments would address the hypothetical scenario in which arbitration was compulsory under California law, a hypothetical that the company did not originally raise or address.

FleetPride appears to take the position in its reply that arbitration would be just as mandatory under California law in a California court as it is under the FAA in a federal court (*see*

Doc. 19 at 2). If that is true, then it is difficult to understand why the company took the time and effort to remove the case to this Court. "It is no secret this District has long faced a widely publicized caseload crisis." *Mollica v. County of Sacramento*, No. 19-02017, 2022 WL 15053335, at *1 (E.D. Cal. Oct. 26, 2022). This District's extremely limited judicial resources have been stretched thinner still in recent years. The Court cannot afford to spend these limited resources unnecessarily. It will not attempt to answer a complex question of California law that a defendant could and should have raised in its opening brief (or even in state court) but instead raised for the first time in reply.

**CONCLUSION**

The motions to remand and compel arbitration (Docs. 6, 16) are **DENIED**.

IT IS SO ORDERED.

Dated: _July 27, 2026_

Jennifer L. Thurston
UNITED STATES DISTRICT JUDGE